GRACE HOSPITAL SOCIETY ET AL. *vs.* THE CITY OF NEW HAVEN ET AL.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 8th—decided July 27th, 1934.

*Philip Pond* and *Frederick H. Wiggin,* with whom were *Walter W. Walsh* and *Frank E. Callahan,* for the plaintiffs.

*Vincent P. Dooley,* with whom was *David J. Mc-Coy,* for the defendant city.

A brief was filed by *Warren B. Burrows,* Attorney-General, *Ernest L. Averill,* Deputy Attorney-General, and *H. Roger Jones,* Assistant Attorney-General.

HINMAN, J.   Material facts alleged in the complaint and admitted for the purposes of this reservation may be summarized as follows: The plaintiffs are all of the public hospitals in New Haven.   They are all charitable corporations chartered by the General Assembly; all of their property is held and administered for charitable uses; their income is derived from voluntary private contributions, State support, and pay or part pay from patients who are able to pay, but many indigent persons are cared for by each hospital free of charge.   They co-operate with the town and city and public charitable authorities in New Haven and other towns to undertake the care and hospitalization of persons who become paupers and charitable charges. Each of the plaintiffs has been charging to and col-

lecting from the defendant city of New Haven for pauper and public charitable patients (other than so-called State patients or cases) hospitalized at the city's expense, or brought to the hospitals by the city's officers or agents, at the rate of $28 a week for all services and supplies. In July, 1933, the hospitals were notified that the board of finance of the city had voted, for reasons specified in the notification, to request that city cases be accepted and treated at a weekly rate of $21 from July 1st, 1933. The hospitals replied by a joint letter declining to accept city patients at less than $4 per day. In January, 1934, the city advanced a claim that General Statutes, Cum. Sup. 1933, § 474b, limits to a maximum of $21 a week the amount that may be recovered or charged by hospitals receiving State aid, for the support of paupers. Thereupon counsel for the plaintiffs joined in requesting the city to co-operate in a suit for a declaratory judgment determining the soundness of this contention, and, as a result, this action was brought, the city and the attorney-general of the State being made parties defendant.

The questions reserved include: "A. Is the amount which the plaintiff hospitals may lawfully charge the defendant, city of New Haven, for pauper and public charitable patients settled in, inhabitants of, belonging to and chargeable to the city of New Haven, brought or sent to one of plaintiff hospitals by the defendant city, its officers, boards or agents, receiving medical attendance or being supported and cared for or hospitalized in the plaintiff hospitals, limited to $21 per week?" "C. Is the amount which the plaintiff hospitals may lawfully charge the defendant, city of New Haven, for pauper and public charitable patients, who are not settled in and are not inhabitants of and who do not belong to the city of New Haven, but who are

brought or sent to plaintiff hospitals by the defendant city, its officers, boards or agents, receiving medical attendance or being supported and cared for or hospitalized in any of the plaintiff hospitals, limited to $21 per week?"

The pivotal point of this reservation is the construction and effect of the provision in General Statutes, Cum. Sup. 1933, § 474b, concerning paupers who are sick and are cared for or supported at a public hospital. The defendants claim that it may and should be construed as limiting to a maximum of $21 per week the amount which may be charged to any town by such a hospital for any pauper, whether or not he is an inhabitant of the town procuring such care or support and primarily liable for the expense thereof. The contention of the plaintiffs is that the limitation extends only to the amount for which the town where the pauper belongs is liable to the town in which he resides and which provided the care or support, and has no effect upon the rate which may be charged by such a hospital for care or support of any pauper.

The history of this statute and those related to it has significance as to the scope of its operation. The enactment first appears in the Revision of 1821 under Title 73, Chapter 1, § 5, which provided: "It shall be the duty of the select-men of every town, whenever a person, not an inhabitant of such town, residing therein, shall become poor and unable to support him or her self, to furnish such pauper, such support as may be necessary." Provision for forfeiture by a selectman for neglecting to furnish such support, and for notice to the town "to which the pauper belongs" is made, followed by "and such town shall not be liable to pay at a greater rate than one dollar per week for the support of a pauper, in lieu of all ex-

penses." Section 6 provides, "Every town incurring necessary expense, pursuant to this act, for a pauper belonging to another town, shall have a right to recover the same from such town, as is provided in the preceding section of this act, by a proper action at common law." See *Kent* v. *Chaplin*, 6 Conn. 72. In the Revision of 1849, § 5, above quoted from, appears in substance as § 16 of Chapter 2, Title 42. Section 17 (passed in 1828) reads: "Whenever a pauper, not an inhabitant of the town where he resides, shall die, it shall be the duty of the selectmen of the town to give said pauper a decent burial, and for the expense of such burial, the town, where such pauper belongs, shall pay a sum not exceeding six dollars." Section 18 is the former § 6, changed to read as follows: "Every town incurring necessary expense, pursuant to the two preceding sections, for a pauper belonging to another town, shall have a right to recover the same from such town, by a proper action at common law." It is to be noted that this recovery section is limited, by reference, to the sections pertaining to aid to paupers belonging to another town.

These sections and their numbers are identical in the Revision of 1854, and in that of 1866 they are §§ 22, 23, and 24 of Chapter 2, Title 50, and are the same except that the limit of liability under § 22 is increased (1857) to $1.50 per week. In 1869 (Public Acts, Chap. 25) this limit was again raised to $3 a week for persons over fourteen years of age, $2 for persons between six and fourteen, and $1.50 for those less than six years of age. In 1874 the limit of liability for expense of burial, under § 23, was made $8. The section as so amended appeared as §§ 5, 6, and 7 of Chapter 2, Title 15, Revision of 1875. In 1878 (Public Acts, Chap. 94) the limit of liability for expense of burial was again increased, to $15, and these statutes

appear without further change as §§ 3304, 3305, and 3306, Revision of 1888, and §§ 2485, 2486, and 2487, Revision of 1902. In 1903, by Chapter 40 of the Public Acts, § 2485 was amended by adding thereto "provided, that where such persons are sick and receive medical attendance or are supported and cared for in a public hospital such town shall not be liable to pay at a greater rate than five dollars per week." Chapter 175, Public Acts of 1917, changed the wording of this addition to "provided, where such persons are sick and receive medical attendance, such town shall not be liable to pay at a greater rate than five dollars per week; and if cared for . . . at a public hospital, not more than ten dollars per week," and added, further, "Any hospital receiving state aid shall charge a uniform rate for paupers receiving medical attendance and being supported and cared for in such hospital, under the provisions of this section." This section as so amended became § 1632 of the Revision of 1918, the burial expense section, § 1633, and the recovery section, § 1634, and §§ 1702 (including amendments not important to the present inquiry, except, the defendant claims, omission of the comma after "hospital" in the amendment last above quoted), 1703, and 1704 of the Revision of 1930. In 1931 further amendments were enacted, General Statutes, Cum. Sup., § 316a, by which it was provided that the town where the pauper belongs "shall not be liable to pay more than the actual disbursements of the town which rendered the aid" nor at greater rates than those specified, all of which were substantially increased, so that § 1702 now reads as quoted in the footnote on page 152.

It will be seen from the foregoing outline of the legislative history of this section and the burial and recovery statutes which follow it that, from inception, while logically included in chapters covering the gen-

eral duties of towns to support paupers, they were designed to serve the distinct object and purpose of providing for the needs of support, care in sickness, and burial in case of death, of a pauper who is in a town of which he is not an "inhabitant" in the sense of ultimate responsibility therefor (*Hartford Hospital* v. *Glastonbury,* 112 Conn. 403, 406, 152 Atl. 576; *New Milford* v. *Sherman,* 21 Conn. 101, 112), also to expressly confer the right of recovery from the town to which he belongs but, at the same time, to definitely limit the extent and amount for which the latter town

---

"Sec. 474b. support of nonresident paupers; notice. When a person not an inhabitant of the town in which he resides shall become poor and unable to support himself, the selectmen of such town shall furnish him with necessary support as soon as his condition shall come to their knowledge, and each selectman neglecting such duty shall be fined seven dollars. The selectmen of each town to which a pauper belonging to another town is chargeable shall give notice of his condition to the town to which such pauper belongs, within fifteen days after they shall know to what town he belongs, and a letter deposited in the postoffice, postage paid, stating the name of the pauper, and that he is chargeable, signed by a selectman of the town where he resides, directed to the selectmen of the town where he belongs, shall be sufficient evidence that notice was given at the time that such letter would, in the usual course of the mail, reach the selectmen to whom it was directed; and actual notice in writing, sent in any other mode, shall be sufficient; and, when the selectmen shall have knowledge of the town where such pauper belongs, such town shall not be liable for any expense for the time during which there was a neglect to give such notice; and such town shall not be liable to pay *more than the actual disbursements of the town which rendered the aid, nor* at a greater rate than *seven dollars* a week for persons over fourteen years of age, *six* dollars a week for persons between six and fourteen years of age; and *four* dollars a week for persons less than six years of age; provided, when such persons shall be sick and receive medical attendance, such town shall not be liable to pay *more than the actual disbursements of the town which rendered the aid,* nor at a greater rate than *fourteen* dollars per week, nor if cared for or supported at a public hospital, *twenty-one* dollars per week. Any hospital receiving state aid shall charge a uniform rate for paupers receiving medical attendance or being supported and cared for in such hospital under the provisions of this section."

may be held liable. Clearly they cannot be so read as to impose any express limitation upon the amount which the town rendering the aid may expend or be charged therefor, and we cannot discern therein any ground for inference or implication of such a restriction. The limitations imposed are significant only of a purpose to protect the town ultimately liable from the recovery of more than certain fixed sums for the purposes specified, and now, in addition, through the amendment of 1931, from recovery of more than the actual disbursements of the claimant town. The purpose of the increases made from time to time in the maximum recovery for the several purposes evidently was to measurably adjust the statutory limitations to changing times, standards, and costs. As the attorney-general observes in his brief, the State has thereby "recognized the evident increased cost for the support and hospitalization of paupers." However, we cannot find in this statute any justification for the claim that it may be construed as expressing an intent which, if entertained, could have been as clearly manifested as to cases within § 474b, General Statutes, Cum. Sup. 1933, and its predecessors as does § 189 of the General Statutes which provides that no hospital receiving State aid "shall charge or receive" more than the specified sum, there $4 per week, "when such expense is to be paid by the state."

We are unable to see that, as asserted by the defendants, the construction of the statute in respects material to the reserved questions is assisted or affected by the addition made to it by the amendment of 1917 that "any hospital receiving state aid shall charge a uniform rate for paupers receiving medical attendance or being supported or cared for in such hospital, under the provisions of this section." Nor can we attach any significance to the omission of the

comma after "hospital" in the Revision of 1918 and subsequently. If, as the defendants claim, this provision was intended to apply to the rate charged for all paupers, wherever resident or belonging, it is fair to assume that the limitation worked by the insertion "under the provisions of this section," which section pertains only to paupers belonging to another town, would have been omitted. Indeed, if the intent had been as the defendants claim, it more appropriately and probably would have been provided for in an independent enactment, instead of appended to a statute the scope of which is manifestly confined to one specified class of paupers. The only intent deducible from it, as passed, is that State aided hospitals may not charge more for paupers belonging to one town, other than that primarily chargeable, than to another; to illustrate: if hospital A treats, in and for town X, paupers belonging to towns L, M, and N, the rates charged for each and all of them must be uniform.

The defendant city argues, with apparent reason, that if a greater charge be allowed against the city by the plaintiff hospitals than the amount to which the statute limits the city's recovery from the town to which the pauper belongs, and the city is obliged to bear the difference between the amount of the charge by the hospitals and that recoverable from the town, an element of injustice is involved. In this situation the applicable rule of statutory construction is that the intention of the legislature as expressed by it must control the action of the judiciary, and "the courts have no other duty to perform than to execute the legislative will, without any regard to their own views as to the wisdom or justice of the . . . enactment." Sedgwick, Construction of Statutory Law (2d Ed.) p. 325; *Kelly* v. *Dewey*, 111 Conn. 281, 284, 149 Atl. 840. Even if we were convinced that

the existence or probability of such a discrepancy had not been brought within the contemplation of the General Assembly, through experience during the long existence of the statute or otherwise, we would be powerless, with a due regard to the limitations of our powers, to usurp the clearly legislative function of remedying it.

Our conclusion is that the amount which the plaintiff hospitals may lawfully charge the defendant city of New Haven for pauper or public charitable patients brought or sent to those hospitals by the city or its agents and cared for or supported therein is not limited, by statute, to $21 per week, whether such patients belong to the city or to some other town.

Our answer to questions A and C is "No." Questions B and D, being dependent upon affirmative answers to A and C, require no answer.

No costs will be taxed in this court.

In this opinion the other judges concurred.